TEXACO PUERTO RICO, INC., peticionaria y recurrente, *v.* JUAN T. PEÑAGARÍCANO, ETC., demandado y recurrido.

*Número*: CE-66-11 *Resuelto*: 21 de febrero de 1967

---

*Beverley, Rodríguez & Reichard* y *Hermán W. Colberg,* abogados de la recurrente; *Miguel Franquiz Ventura, Eduardo A. Ruiz* y *José E. Rodríguez Rosaly,* abogados del recurrido.

Sala Primera integrada por el Juez Asociado Señor Pérez Pimentel como Presidente de Sala y los Jueces Asociados Señores Blanco Lugo, Rigau y Ramírez Bages.

EL JUEZ ASOCIADO SEÑOR RAMÍREZ BAGES emitió la opinión del Tribunal.

Vuelve ante nuestra consideración el determinar, bajo las circunstancias de este caso, lo que constituye un "negocio en marcha" a los efectos de su exclusión del ámbito de la Ley de Alquileres Razonables (17 L.P.R.A. secs. 181–218), y su Reglamento de Inquilinato, aprobado en 15 de diciembre de 1964 (17 R.&R.P.R. sec. 186–27(b)). [1]

Concluimos que el tribunal de instancia incurrió en error al determinar que la estación de gasolina en cuestión no era un negocio en marcha cuando se arrendó a los señores Jaime Enrique y Ernesto Enrique Escabí, fundándose en que "Dicha operación y clientela tiene que ser por el arrendador para que pueda caer bajo la excepción. Creemos y resolvemos que no le favorece la operación o clientela de un arrendamiento . . . se requiere operación, por el arrendador al efecto de que al arrendarlo está entregando por el canon estipulado un negocio en marcha, con clientela, nombre, etc., y no una serie de equipo o productos." Resolvemos, por el contrario, que al arrendarse dicha estación, era un negocio en marcha, pues un anterior propietario de la misma, la Pyramid Products Inc. (anterior nombre de la Regent Petroleum Co.) la había operado años antes, luego las facilidades del negocio fueron reconstruidas y el mismo arrendado al Sr. Benito Beauchamp Lecodet de quien los Escabí compraron la estación y cierto equipo al arrendar de la Regent Petroleum Co. la referida estación en 16 de agosto de 1955, conviniéndose entonces el pago de un canon de arrendamiento de $150 mensuales. Por último, los Escabí suscribieron un nuevo contrato de arrendamiento del negocio en cuestión con la recurrente en 26 de abril de 1961, cuando el negocio pasó a ser propiedad de la recurrente como parte de los bienes de la Regent Petroleum Co. que la recurrente adquirió.

---

[1] La referida disposición del citado Reglamento dispone que el mismo no se aplicará a "(5) Los llamados 'negocios en marcha', según jurisprudencia sentada por el Tribunal Supremo de Puerto Rico."

No creemos que a los efectos de que se reconozca que una operación comercial o industrial es un "negocio en marcha", es indispensable establecer que el arrendador lo estuviese explotando al momento de hacerlo disponible a un arrendatario. A nuestro juicio, basta con que con anterioridad al arrendamiento que motiva la controversia, el arrendador o uno de sus antecesores en título lo operase aunque luego el negocio fuese objeto de mejoras sustanciales tanto por razón de la construcción de nuevas y la ampliación de edificaciones como por la instalación de equipo y facilidades adicionales de servicio, siempre que no hubiere dejado de operarse excepto por razón de las interrupciones motivadas por las obras de construcción o instalación de las mejoras.

En el caso ante nos, la Texaco Puerto Rico, Inc., dueña de una estación de servicio de gasolina en la calle Post de Mayagüez, cedió dicha propiedad, en 26 de abril de 1961, a los hermanos Escabí, mediante un contrato titulado "Arrendamiento de Negocio" el cual incluía "todos los edificios existentes en el inmueble, así como la estación de servicio de gasolina con todas sus facilidades, instalaciones, mejoras, buena voluntad (good will) del negocio establecido y en marcha (going concern), incluyendo el equipo ampliamente descrito en el aditamento que forma parte íntegramente de este contrato . . ." Se convino, (a) un año como término del contrato, prorrogable automáticamente a menos que una de las partes diese aviso en contrario con 60 días de anticipación a cualquier vencimiento del contrato; (b) un canon de un centavo por galón de gasolina comprada a la arrendadora, con un mínimo de $170 mensuales; (c) que el arrendatario no podía efectuar alteraciones, remociones o construcciones en la estación de servicio, ni cambiar, mover o remover tanques o equipo sin el consentimiento escrito de la arrendadora; (d) que el arrendatario sólo podía usar la propiedad para la operación de un negocio de estación de servicio de gasolina; (e) que el equipo instalado en la estación habría de

ser usado únicamente para el almacenamiento y venta de productos Texaco; (f) que el arrendatario no podría transferir ni ceder el mismo en todo o en parte sin el consentimiento escrito de Texaco, terminando dicho contrato con la muerte del arrendatario, entre otras causas; (g) que el arrendatario permitiría el libre acceso al inmueble a representantes autorizados de Texaco con el propósito de inspeccionar la estación y las facilidades allí existentes, con el fin de dar el mejor servicio y ofrecer la mejor apariencia; (h) que lo que comprendía el arrendamiento es un negocio establecido y en marcha (*going concern*); (i) que el arrendatario no era el dueño de dicho negocio y sí lo era la arrendadora; (j) que éste no era un contrato de arrendamiento de un local para comercio o para establecer en el mismo un negocio o industrial perteneciente al arrendatario; y (k) que el inmueble y el equipo objeto de este contrato constituían una sola unidad que ha sido arrendada como negocio propiedad de la arrendadora, el cual explotaría el arrendatario como comerciante independiente.

En 24 de marzo de 1964 se querelló Jaime Enrique Escabí ante el Administrador de la Oficina de Estabilización Económica de que le habían "subido la renta de $150 al mes, a un centavo por galón que asciende a $300 ó $320 dólares por mes, el doble de la renta" del negocio en cuestión. Celebrada la vista del caso en 30 de abril de 1964, dicho Administrador en 9 de junio del mismo año, declaró sin lugar la solicitud de la arrendadora de que se declarase que lo arrendado a los Escabí era un negocio en marcha, por razón de que era necesario que el mismo fuese operado por el arrendador antes de cederlo en arrendamiento y que "Ni la Regent Petroleum Co. ni la Texaco operaron la estación de gasolina antes de arrendarla a los señores Escabí con las edificaciones, equipo y facilidades que existen en el presente." Recurrió la arrendadora ante el Tribunal Superior, Sala de San Juan, el cual confirmó la resolución del referido Administrador por las

razones que relacionamos al comienzo de esta opinión.

Hemos tenido ocasión de considerar lo que constituye un negocio en marcha en cuatro ocasiones anteriores. En *Mejías, Admor.* v. *Tribl. Superior*, 75 D.P.R. 447 (1953), dictaminamos que el arrendamiento de un establecimiento mercantil que se dedicaba al negocio de hotel no constituía el arrendamiento de un negocio en sí, y por lo tanto, fuera del ámbito de la Ley de Alquileres Razonables, ya que los bienes muebles y mobiliario que estaban dentro del hotel fueron vendidos separadamente al arrendatario, de manera que "el vínculo arrendaticio tuvo por objeto primordialmente, el edificio en donde ubicaba el negocio de hotel, y no el negocio en sí, independientemente del edificio." En *Sucn. Ramírez* v. *Corte*, 70 D.P.R. 799 (1950), se trataba del arrendamiento de una estación de gasolina construida por el arrendador en un solar de su propiedad, arrendada por éste a la Texas Co. (of P.R.) cuando la terminó, luego fue arrendada a otro quien cedió el arrendamiento al demandado. Concluimos que se trataba de un negocio no exento de las disposiciones de la Ley de Alquileres Razonables porque, si bien se admitió que cuando el demandado adquirió la estación de gasolina allí había un negocio en actividad, el mismo no pertenecía al arrendador, sino a un anterior arrendatario de quien el demandado lo compró; que en tales circunstancias la situación de los peticionarios equivale a la del que prepara un local para negocio y lo alquila a otro, quien explota el negocio. Dijimos que nuestras decisiones en *Ortiz* v. *Cesaní*, 68 D.P.R. 412 (1948) y *Orsini* v. *Sánchez*, 67 D.P.R. 863 (1947), no son de aplicación porque en éstos el arrendador estuvo explotando el negocio hasta el momento en que lo cedió en arrendamiento al demandado de manera que se trataba de negocios en marcha no sujetos a la Ley de Alquileres Razonables.

La prueba en este caso demostró que originalmente en la propiedad en cuestión, calle Post Núm. 100, de Mayagüez,

existía un ranchón de madera "al cual se le puso una fachada de lo que se conoce como 'High Reed' " (quiere decir, "high rib"—construcción liviana de plancha de malla de acero expandida y empañetada—) y "Se habilitaron en ella dos bombas de gasolina con dos tanques pequeños. Cuando esto sucedió se puso un empleado de la compañía, que entonces se llamaba 'Pyramid Products Inc.' bajo la supervisión directa del agente de la compañía Pyramid, en Mayagüez." Luego se cambió el nombre de Pyramid a Regent. Más tarde la Regent amplió las facilidades en la propiedad a los efectos de proveer una estación moderna de gasolina y la habilitó con equipo de su propiedad e inmediatamente la arrendó al Sr. Benito Beauchamp Lacodet. En agosto de 1955, la Regent arrendó la propiedad a los hermanos Escabí. En junio de 1958, la Regent vendió todas sus propiedades en Puerto Rico a la recurrente. Entre las mismas se incluyó la estación de gasolina en cuestión. En 26 de abril de 1961, los Escabí firmaron conjuntamente con la recurrente, el contrato de arrendamiento de la propiedad el cual da lugar a esta causa.

■ Como dijimos inicialmente, a los efectos de que una operación industrial o comercial sea un "negocio en marcha" y por lo tanto, libre de las restricciones de la Ley de Alquileres Razonables, no es requisito indispensable que el arrendador lo estuviera operando inmediatamente antes de cederlo al arrendatario. Ni la ley ni nuestra jurisprudencia han establecido tal requisito. Lo que sí es esencial es que el negocio hubiese estado en operación por un dueño del mismo con anterioridad al arrendamiento que da lugar a la queja o querella ante el Administrador de Estabilización Económica. Una vez que ha ocurrido tal operación anterior y no haya habido interrupción en la operación excepto por fuerza mayor o como en este caso, el negocio se convierte en un "negocio en marcha" y a partir de ese momento no deja de serlo por el hecho de que se alquile a arrendatarios subsiguientes y se

ceda o venda a otros propietarios, y se amplíe y modernice en forma sustancial en el curso de esas transacciones.

En España se halla excluido del ámbito de la Ley de Arrendamiento Urbano el arrendamiento de industria o negocio. Dice Castán: (Castán, *Tratado Práctico de Arrendamiento Urbano*, tomo 1, pág. 212.)

"No es necesario, en cambio:

(a) Que la industria esté directamente explotada por el arrendador, lo que se opondría al concepto de industria que desnaturalizaría en la primera cesión arrendaticia, con olvido de lo que en sí es objetivamente considerada (sentencia de 10 de mayo de 1955). De aquí que sea indiferente que el negocio viniera explotado por personas distintas del arrendador (sentencia de 20 de junio de 1955), aunque aquéllas lo explotaran en régimen de empresa (sentencia de 21 de noviembre de 1952), y, que el arrendador no hubiere ejercido formalmente el negocio, si estuvo a cargo de personas que obraron en su nombre o como arrendatarios de los titulares de la propiedad (sentencias de 27 de septiembre de 1949 y 13 de enero de 1953)."

En la sentencia del Tribunal Supremo de España de 10 de mayo de 1953 (51 Jurisprudencia Civil 150, 161), se trataba del arrendamiento de un local de cinematografía que fue operado por su dueño, después por dos arrendatarios por varios años y por último por el tercero objeto del desahucio hasta que fue clausurado por las autoridades debido a no cumplirse con determinadas condiciones técnicas y de seguridad. El propietario, aunque no logró que el arrendamiento se diera por terminado, procedió a reconstruir el negocio. En defensa se alegó que se trataba del arrendamiento de un local y no de una industria ya que la Ley de Arrendamientos exige que para ser industria debía existir una explotación del negocio en fecha inmediatamente anterior a la del contrato de arrendamiento y que esa explotación fuese llevada a cabo por el mismo propietario de la cosa

arrendada. Al resolver que se trataba de un arrendamiento de industria, dijo el tribunal que:

". . . al declarar la sentencia recurrida, que lo arrendado es industria, no local de negocio, motivo que se ha de desestimar, toda vez, que lo arrendado fue, además del local, una unidad patrimonial con vida propia y susceptible de ser inmediatamente explotada, ya que reunía todos los elementos necesarios para poder proyectar películas, y así se hizo por el recurrente, que era el fin a que estaba destinado, sin que pueda afectar a esta conceptuación el bueno o mal éxito de la explotación, pues el arrendamiento de una industria no está vinculado a la seguridad de un beneficio económico, ni tampoco el que existan arrendamientos sucesivos, puesto que, ni el citado artículo, ni la doctrina de la jurisprudencia exige que la industria establecida en el local, y que se da en arrendamiento esté directamente explotada por el arrendador, lo que se opondría al concepto de industria que se desnaturalizaría en la primera cesión arrendaticia, con olvido de lo que en sí es objetivamento considerada, ni por último tampoco existe la interrupción en su funcionamiento, alegada, en cuanto este motivo acredita que el espectáculo se daba en determinadas fechas como conveniencia del negocio, y beneficio del que ejercía la industria, dada la coincidencia de fechas entre los arrendamientos anteriores." (²)

En su sentencia de 30 de junio de 1951 (35 Jurisprudencia Civil, pág. 547), sostuvo el Tribunal Supremo de España que aun cuando al concertarse el arrendamiento, la industria no se hallase en explotación, se trataba del arrendamiento de una industria porque su inactividad temporal no cambia su naturaleza dado que conserva su estructura y propia finalidad; que "lo que se requiere es que la industria existiera con anterioridad, y que al otorgarse el

---

(²)Véanse, además, las sentencias del Tribunal Supremo de España de 16 de octubre de 1954 (48 Jurisprudencia Civil, págs. 91, 102, 103); de 5 de abril de 1954 (46 Jurisprudencia Civil, págs. 623, 635); de 6 de noviembre de 1953 (44 Jurisprudencia Civil, págs. 491, 492, 501); de 13 de enero de 1953 (41 Jurisprudencia Civil, págs. 89, 95); de 10 de noviembre de 1952 (40 Jurisprudencia Civil, págs. 443, 444, 447); de 30 de octubre de 1951 (36 Jurisprudencia Civil, pág. 483).

contrato, el arrendatario hallándola ya creada en el mismo local con ella arrendado, la ponga en funcionamiento con los elementos que se le entreguen, aunque por su utilidad, ventaja o comodidad adiciona alguna por su parte."

En su sentencia de 27 de septiembre de 1949 (27 Jurisprudencia Civil, págs. 539, 540, 548), el referido tribunal específicamente sostuvo qué el hecho que ni el arrendador ni su causante hayan ejercido personalmente la industria (de fabricación de harinas) objeto del arrendamiento "es intrascendente en este juicio, porque en todo caso la propiedad y el disfrute de la industria pertenecía y pertenece a las demandas [sic] y en otro tiempo a su causante, y en tal concepto han podido arrendarla sin que a ello se oponga el que su funcionamiento fue ejercido inmediatamente por otras personas que nunca obraron como dueños, sino a nombre o como arrendatarios de los propietarios."

*En vista de lo expuesto, se revocará la sentencia del Tribunal Superior, Sala de San Juan, de 5 de enero de 1966, así como la resolución del Administrador de Estabilización Económica, de 9 de junio de 1964, y se ordenará a dicho tribunal que devuelva el caso al referido Administrador para que proceda en forma consistente con esta opinión.*

El Juez Asociado Señor Blanco Lugo concurre en el resultado.